UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:23-cv-00218-GCM

| | |
|---|---|
| S. SHANE SMITH, ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| vs. ) | **ORDER** |
| ) | |
| NORTH CAROLINA DEPARTMENT ) | |
| OF ADULT CORRECTION, et al. ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

**THIS MATTER** is before the Court on Plaintiff's "Request for Temporary Restraining Order and/or Preliminary Injunction." [Doc. 42].

**I.     BACKGROUND**

Pro se Plaintiff S. Shane Smith ("Plaintiff") is a prisoner of the State of North Carolina currently housed at Foothills Correctional Institution ("Foothills") in Morganton, North Carolina. He originally filed this action in the Eastern District of North Carolina on November 16, 2022, against Defendants North Carolina Department of Adult Corrections (NCDAC); Todd Ishee, the NCDAC Secretary; John/Jane Doe, the Americans with Disabilities Act (ADA) Coordinator; and Teresa Jardon, the Foothills Warden, claiming that Defendants violated his rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq., and the Rehabilitation Act of 1973 ("Rehab Act"). [Doc. 1]. On January 27, 2023, District Judge Terrence W. Boyle ordered that this action be transferred to this Court because Foothills is in the Western District.[1] [Doc. 9]. After failing this Court's initial review, Plaintiff timely filed an Amended Complaint

---

[1] For reasons unknown to the Court, this matter was not opened as a new case in this District until August 16, 2023. [See Doc. 12].

in which he named the following Defendants: (1) the NCDAC; (2) Todd Ishee, "Commissioner of Prisons;" (3) Teresa Jardon, Foothills Warden; (4) John Coleman, Director of N.C. Correctional Enterprise (NCCE)[2]; (5) Sophia Feaster, Division ADA Coordinator; (6) Monica Teague, Region ADA Coordinator; and (7) Deorain Carson, Facility ADA Coordinator. [Docs. 14, 15]. Plaintiff purported to sue all Defendants in their individual and official capacities. [See id. at 4-6].

Plaintiff alleged as follows. Plaintiff was born without fingers and toes and has "extremely sensitive skin." [Id. at 8]. He has no grip with his right hand and limited grip with his left hand. [Id.]. On his left hand, Plaintiff has what some might mistakenly assume is a thumb, but rather is "the root from which a thumb would extend." [Id.]. Plaintiff is very limited in how he performs manual tasks and even the slightest alteration in their performance causes him "excruciating physical pain and great discomfort." [Id.]. The appendage "that is often misidentified as a thumb is [Plaintiff's] primary tool" for feeding, dressing, and caring for himself, "all only if appropriately accommodated." [Id. at 8-9].

Once in NCDAC custody, in or around 1993, prison officials provided Plaintiff numerous disability accommodations and allowed Plaintiff to receive numerous items from family members that were necessary for Plaintiff to perform simple daily tasks. [Id. at 6, 11]. After nearly 15 years of incarceration, Plaintiff was transferred to a facility where officials "arbitrarily took it upon [themselves] to rescind all of [his] previously approved disability accommodations." [Id.]. In 2007, Plaintiff filed a civil action under the ADA and Rehab Act in the United States District Court for the Eastern District of North Carolina, Smith v. Beck, No. 5:07-CT-3034-FL

---

[2] Plaintiff alleges that, as Director of the NCCE, Defendant Coleman "is responsible for the administration, operation, and supervision of all NCCE industry plants, staff and facilities; and the promulgation and enforcement of laws, rules, regulations, policies, and practices relevant to them." [Doc. 15 at 4-5].

(E.D.N.C.). [Id. at 11-12]. Ultimately, that action was resolved by a Settlement Agreement (the "Agreement") between the Plaintiff and the NCDAC whereby the NCDAC agreed, among other things, to provide Plaintiff with "appropriate clothing and assistive devices" for his disabilities and the opportunity to buy other identified items at his own expense. [See Doc. 15-2 at 114-22]. In reaching this agreement, it was determined that the NCCE could not provide the items that Plaintiff needed and that they would need to be purchased from outside vendors, such as Walmart. The items included bed linens, boxer shorts, shirt jackets, t-shirts, pants with sufficient pockets, a belt, bath towels and face cloths, crew socks, a digital pocket radio, radio headphones, a nylon zippered notebook, an analog watch, and rubber-gripped pens. [Doc. 15 at 13-17]. The clothing and linen items were to be made of 100% cotton and washed only in special detergent. [Doc. 15-2 at 115-16].

After filing another civil rights action, Smith v. Perry, 1:16-CV-396-TDS-LPA (M.D.N.C.), prison officials "all but stopped providing clothing which met [Plaintiff's] specific disability accommodation needs and completely stopped permitting [him] to purchase at [his] expense the non-clothing and linen items [he] used as accommodation assistive devices." [Id.; see id. at 17-24]. "The change of [Plaintiff's] clothing which accommodated [his] disability served absolutely no penological purpose other than to harass, belittle, intimidate, and retaliate against [Plaintiff] for the expression of [his] grievances and for [his] previous civil rights litigation." [Id. at 24-25].

After discussing his disability needs with his housing unit's supervisory staff, supervisory staff informed Plaintiff that Defendant Jardon had rejected his request for accommodation. [Id. at 25]. On June 30, 2022, after discussing his disability needs with the Foothills medical department and obtaining a referral, Plaintiff was assessed by an occupational therapist. [Id.]. It

3

was determined that "the requested and previously provided items were the most appropriate accommodation for [Plaintiff's] unique disability." [Id.]. Shortly after his appointment with the occupational therapist, prison officials told Plaintiff that they were not going to implement the occupational therapist's recommendations. [Id.]. Thereafter, Plaintiff submitted an official NCDAC Offender Reasonable Request for Accommodation ("ADA Request"), "pleading prison officials to provide the various items which accommodated [Plaintiff's] disability." [Id.]. Defendants Teague, Feaster, and Carson denied Plaintiff's numerous ADA Requests. [Id.].

Plaintiff claims that Defendants' acts and omissions have violated his rights under the First, Eighth, and Fourteenth Amendments and the ADA and Rehab Act. [Id. at 28-30]. Plaintiff also purported to state a claim against Defendants Ishee, Coleman, Feaster, Teague, and Jardon for the "failure to train and/or supervise employees," which the Court construed under the Eighth Amendment. [Id. at 30-31]. For injuries, Plaintiff alleges that he has suffered "physical harm, severe emotional trauma, and loss of liberty." [Id. at 31]. For relief, Plaintiff seeks a declaratory judgment; monetary relief, including punitive damages; and injunctive relief, including the provision of various clothing items, linens, personal care items, and permission to purchase other items at his own expense, all as reasonable accommodations for his disabilities under the ADA. [Id. at 32-33]. Relevant here, the Court allowed Plaintiff's ADA and Rehab Act claims against Defendant NCDAC to proceed on initial review.[3] [Doc. 16].

Now before the Court is Plaintiff's motion for preliminary injunction. [Doc. 42]. Plaintiff asks the Court to order Defendants to provide him at least six (6) pairs of 100% cotton hunter green pants "identical in structure" to Wrangler pants previously provided to Plaintiff by

---

[3] Plaintiff's individual capacity First Amendment retaliation claims against Defendants Feaster, Teague, Jardon, and Carson also survived initial review. Plaintiff's remaining claims and Defendants Ishee and Carson were dismissed for the reasons stated in the Court's initial review Order. [Doc. 16].

4

prison officials and at least four (4) long-sleeve 100% cotton hunter green "shirt jackets" to "properly accommodate his disability." [Doc. 42 at 1-2]. Alternatively, Plaintiff asks that he be permitted to purchase the required clothing items until a hearing can be held. [Id. at 1].

In support of his motion, Plaintiff attests as follows. The NCCE manufactures the standard clothing issued to general population inmates in North Carolina. [Doc. 42-5 at ¶ 4]. The clothing items provided by the NCCE do not accommodate Plaintiff's most basic daily needs. [Id.]. Plaintiff's 2007 lawsuit in the Eastern District, in which he alleged violations of the ADA, was resolved through the Agreement pursuant to which prison officials agreed to provide clothing that accommodated Plaintiff's disability. [Doc. 42-5 at ¶¶ 5-7]. Under the Agreement, officials were to provide Plaintiff with clothing made of 100% cotton. After learning Plaintiff's specific needs, officials informed Plaintiff they would be acquiring his clothes through an outside supplier. The pants purchased from the outside supplier, usually Walmart, were 100% cotton with zippers and equipped with two front and back pockets and appropriate belt loops. These pants met Plaintiff's accommodation needs.[4] [Id. at ¶ 8].

"At some point," without Plaintiff's input, prison officials changed Plaintiff's clothing to items that did not accommodate his disability. [Id. at ¶ 13]. The newly issued pants had no front or back pockets, only cargo pockets that Plaintiff is physically unable to use or reach. [Id. at ¶ 15]. Plaintiff is unable to functionally dress or undress with the NCCE-designed pants. [Id.

---

[4] Given the nature of Plaintiff's disability, he regularly relies on pants pockets because he cannot carry items in his hands like people with fingers. [Doc. 42-5 at ¶ 10]. Because of his disability, Plaintiff needs to carry flex knuckle bandages, tweezers to manipulate smaller, more intricate items, and nail clippers to open food packages and perform other small tasks. [Id. at ¶ 17]. When dressing himself, Plaintiff relies on belt loops to pull up his pants and to pull together the fly to zip his pants because he cannot otherwise grasp the pants as necessary to accomplish these tasks. [Id. at ¶ 11]. Without belt loops, it is very difficult and sometimes painful for Plaintiff to dress and undress or use the bathroom. [Id.]. In his unsworn memorandum, Plaintiff acknowledges that at Foothills he is allowed to wear athletic shorts while on facility grounds. [Doc. 42-4 at 2]. He states, however, that he will not be permitted to wear these shorts at Rutherford CC "where Plaintiff is slated to transfer." [Id.].

5

at ¶ 16]. In May 2021, officials purchased Plaintiff two pairs of pants from Walmart that accommodated Plaintiff's disability. Additional pants were to be purchased, but never were. [Id. at ¶¶ 19, 21]. (Presumably later) in 2021, officials confiscated those pants. [Id. at ¶ 21]. In October 2021, NCDAC's in-house legal counsel informed Plaintiff that he would be allowed to keep the clothing and linen items purchased for him from Walmart, but that when these items need to be replaced, NCDAC would utilize approved-vendor NCCE. [Id. at ¶ 21]. In-house counsel also informed Plaintiff that the Warden acquired the items from Walmart "out of an abundance of caution and to ensure the settlement agreements were complied with[.]" [Id.].

Every prisoner is issued shirt jackets, which are long-sleeved button-up shirts, at no cost to the prisoner. Shirt jackets are necessary for warmth and protection from the elements. Plaintiff has none. [Id. at ¶¶ 23-24]. Non-disabled prisoners are provided clothing appropriate to meet theirs to participate in their respective assigned jobs and/or program assignments at no cost to the prisoner. [Id. at ¶ 28]. Plaintiff seeks the same opportunity. [Id.].

On June 6, 2024, Plaintiff was awarded participation in the Mutual Agreement Parole Program (MAPP). Under the MAPP, Plaintiff's parole date is now June 1, 2027. [Id. at ¶¶ 29, 31]. The MAPP first allows Plaintiff to leave the correctional facility with a community volunteer several times weekly to attend various community events. [Id. at ¶¶ 29-30, 33]. For this purpose, Plaintiff is permitted to purchase clothing items at his own expense and have them mailed or delivered to him at his facility. [Id. at ¶ 34]. If Plaintiff were to fail to meet the terms of the MAPP, his release date could be extended or his chance at parole lost.[5] [Id. at ¶ 32].

---

[5] In his unsworn memorandum, Plaintiff also contends that, as part of his MAPP, he is being immediately assigned to a job that requires him to leave the facility each day and that he currently has "only two pairs of pants which adequately meet his disability needs." [Doc. 42-4 at 2]. It is unclear if these are the same two pairs of pants that were confiscated in 2021 or different pants subsequently obtained for the Plaintiff.

6

Defendants responded to Plaintiff's motion. [Docs. 46, 46-1 to 46-7]. In addition to their memorandum, Defendants provided the sworn testimony of Ladonna Browning, the NCDAC Western Region Director; Sharon Jones, the General Manager of Manufacturing at NCCE; Mary Stevens, the Chief Administrator for the North Carolina Post-Release Supervision and Parole Commission ("Parole Commission"); and Aaron Clarke, a Parole Case Analyst with the Parole Commission, as well as filings from and the final decision in a lawsuit Plaintiff filed in the Superior Court of Rutherford County to enforce the terms of the Agreement (the "Rutherford County lawsuit"). [Docs. 46-4 to 46-7]. Defendants paint a somewhat different picture of events bringing us to the present motion: Plaintiff's 2007 Eastern District lawsuit which, in 2011, resulted in the Agreement whereby the North Carolina Department of Public Safety (NCDPS)[6] agreed to provide Plaintiff 100% cotton clothing. [Doc. 46 at 2 (citing Doc. 46-1 at 14-22)]. In 2020, Plaintiff filed the Rutherford County lawsuit alleging breach of the Agreement. [Id. (citing Doc. 46-1 at 5-8)]. In that action, Plaintiff moved for a preliminary injunction asking the court to order the NCDPS to provide Plaintiff with Wrangler Jeans and other clothing items. [Id. at 3 (citing Doc. 46-2)]. Defendants in that action provided that, when Plaintiff was housed at Rutherford Correctional Center ("Rutherford CC"), he had managed to obtain Wrangler Jeans and other retail items, but that he was unable to obtain these items at Foothills. [Id. (citing Doc. 46-3)]. The Superior Court granted summary judgment for defendants in that matter, finding as a matter of law that defendants had satisfied the terms of the Agreement. [Id. (citing Doc. 46-3)].

Ladonna Browning, NCDAC Western Region Director, generally oversees all prison facilities in the Western Region. [Doc. 46-4 at ¶ 2: Browning Dec.]. Browning is familiar with

---

[6] The relevant arm of the NCDPS is now known as the NCDAC.

the Plaintiff and with prison operations. [Id.]. Browning attests that while Plaintiff was assigned to Rutherford CC he was able to obtain Wrangler Jeans and other retail clothing in error. This is because, at the time, Rutherford CC did not have a copy of the Agreement. When Plaintiff was transferred to Foothills, compliance with the Agreement was more carefully managed. [Id. at ¶ 3]. There is currently no plan to transfer Plaintiff back to Rutherford CC and any such transfer would have to be approved by Browning. While the MAPP includes a recommendation that Plaintiff be transferred to Rutherford CC, such transfer depends on availability and is not guaranteed. [Id. at ¶ 3].

NCCE provides prisoner clothing. [Doc. 46-4 at ¶ 4]. The provision of prisoner clothing by NCCE allows for "the security of knowing where clothing is sourced and its design, for the orderly operations of procurement, and maintaining uniformity among the prison population." [Id.]. Offenders are not allowed to shop for retail clothing. When offenders are assigned to work release jobs, they wear prison clothes. If alternative clothing is required by the employer, NCCE can provide the clothing and there is no need for an outside purchase. [Id.]. This is also true for community passes. Nearly 100% of community passes are to attend community church services or NA or AA meetings. Offenders usually wear prison clothes to these activities. If Plaintiff were to need civilian style clothing or special work clothing due to the preferences of a church or employer, the clothing items would be made by special order through the NCCE. [Id. at ¶ 5]. The only opportunity immediately available to the Plaintiff is a Community Volunteer pass, which depends on availability and finding a sponsor. [Id. at ¶ 6]. Plaintiff has no community passes set up at this time. [Id. at ¶ 5]. Although Plaintiff has been approved for immediate work assignments offside, he is not eligible for work release until June 2025 and his home leave does not begin until June 2026. [Id.; Doc. 46-6 at ¶ 10: Stevens Dec.]. According to Mary Stevens,

8

Chief Administrator for the Parole Commission, Plaintiff's MAPP agreement does not specify any clothing requirements for his MAPP program participation. [Doc. 46-6 at ¶¶ 1, 11]. Moreover, Aaron Clarke, Plaintiff's Parole Case Analyst, testifies that he is unaware of any special clothing requirements with the MAPP agreements. He further testifies that if any offender were unable to comply with their MAPP agreement through no fault of their own, they would not be considered noncompliant. [Doc. 46-7 at ¶¶ 2-3: Clarke Dec.].

According to Sharon Jones, NCCE General Manager of Manufacturing, NCCE can manufacture any clothing necessary to meet Plaintiff's needs. [Doc. 46-5 at ¶ 2: Jones Dec.]. While prison clothing uses buttons, not zippers, NCCE can modify clothes for the Plaintiff to use Velcro instead. Pants can also be made with additional belt loops with pockets in various places or with elastic waists. In short, NCCE can design and make any garment necessary. [Id. at ¶ 3].

## II.     STANDARD OF REVIEW

Before the entry of a final judgment, a court may enter a preliminary injunction. Fed. R. Civ. P. 65(a). "The traditional office of a preliminary injunction is to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." United States v. South Carolina, 720 F.3d 518, 524 (4th Cir. 2013) (citation omitted). A preliminary injunction is "an extraordinary remedy" that "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.E.2d 249 (2008). Preliminary injunctions are afforded before trial at the discretion of the district court. In re Microsoft Corp. Antitrust Litig., 333 F.3d 517, 524-26 (4th Cir. 2003).

## III.    DISCUSSION

To obtain a preliminary injunction, the plaintiff must establish (1) that he is likely to

succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. Real Truth About Obama, Inc. v. Fed. Election Comm'n, 575 F.3d 342, 346 (4th Cir. 2009); see Winter, 555 U.S. at 21. When the constitutional violation is "likely," several of these factors are satisfied. Leaders of a Beautiful Struggle v. Balt. Police Dep't, 2 F.4th 330, 346 (4th Cir. 2021) (en banc). That is, when "there is a likely constitutional violation, the irreparable harm factor is satisfied" because "the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitute irreparable injury.'" Id. (quoting Mills v. District of Columbia, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (internal quotation omitted)). The final two factors are satisfied when there is a likely constitutional violation because "the public interest favors protecting constitutional rights" and "a state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional." Id. (quoting Centro Tepeyac v. Montgomery Cnty., 722 F.3d 184, 191 (4th Cir. 2013)). Thus, where a constitutional violation is "likely," the inquiry collapses into the first factor, the likelihood of success on the merits. See Mahmoud v. McKnight, 2023 WL 5487218, at *14 (D. Md. Aug. 24, 2023), affirmed 102 F.4th 191 (4th Cir. 2024).

In his Amended Complaint in this matter, Plaintiff alleges that Defendants have violated his rights under the ADA and the Rehab Act by refusing to provide (and/or to allow him to purchase at his own expense) various clothing items, linens, and personal care items that have, at least at one time or another during Plaintiff's incarceration, been provided to and/or accessible by him to accommodate his disability. [See Doc. 15]. In the pending motion, Plaintiff asks the Court to order Defendants to provide him with at least six (6) pairs of Wrangler pants or their

structural equivalent and at least four (4) shirt-jackets. [Doc. 42]. Plaintiff advises these items can be purchased at outside retailers like Walmart, J.C. Penney's, or Cabela's. [Id. at 2].

## A. Shirt-Jackets

The Court will deny Plaintiff's motion as to the shirt-jackets. Plaintiff's request for this item has nothing to do with the action before the Court. Plaintiff did not allege and has not now shown that shirt-jackets are necessary to accommodate his disability. Rather, he alleges that they are provided to all prisoners for warmth and to protect from the elements and that he currently has none. The implication from Plaintiff's materials is that he now needs shirt-jackets because his MAPP agreement allows for additional opportunities to leave the facility. While Plaintiff may be entitled to shirt-jackets as a prisoner of the State of North Carolina, their alleged denial is unrelated to his disability or to the pending action. As such, the Court will deny Plaintiff's motion on this issue.

## B. Wrangler pants

In the pending motion, Plaintiff contends that his disability requires Wrangler pants, which can be purchased from outside retailers. [Doc. 42]. Plaintiff's Amended Complaint similarly alleges the need for retail clothing to accommodate his disability. [Doc. 15]. To be awarded injunctive relief, Plaintiff must demonstrate a likelihood of success on the merits.

To demonstrate a likelihood of success on the merits, "[a] plaintiff need not establish a certainty of success, but must make a clear showing that he is likely to succeed at trial." Di Biase v. SPX Corp., 872 F.3d 224, 230 (4th Cir. 2017).

Under Title II of the ADA, "no qualified individual with a disability shall, by reasons of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132. The ADA defines "public entity"

11

to include "any State or local government" and "any department, agency, … or other instrumentality of a State." United States v. Georgia, 546 U.S. 151, 126 S.Ct. 877 (2006) (citing 42 U.S.C. § 12131(1)).  "[T]his term includes state prisons."  Id. (citing Pennsylvania Dept. of Corrections v. Yeskey, 524 U.S. 206, 210, 118 S.Ct. 1952 (1998)).

To establish a prima facie case under Title II of the ADA, a plaintiff must show that: (1) he has a disability; (2) he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities for which he was otherwise qualified; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability.  Miller v. Hinton, 288 Fed. App'x 901, 902 (4th Cir. 2008) (citations omitted).  States are obligated to make "reasonable modifications" to enable the disabled person to receive the services or participate in programs or activities.  42 U.S.C. § 12131(2).  The duty of reasonable accommodation, however, must also consider whether the institution's actions are related to legitimate penological interests.  See Turner v. Safley, 482 U.S. 78, 89, 107 S.Ct. 2254 (1987); Tanney v. Boles, 400 F.Supp.2d 1027, 1050 (E.D. Mich. 2005) (noting that courts have applied Turner to ADA and Rehab Act claims).  A plaintiff must also establish an actual injury from any alleged ADA or Rehab Act violation.  See Rosen v. Montgomery Cty. Md., 121 F.3d 154, 158 (4th Cir. 1997).

The Rehabilitation Act provides that "no otherwise qualified individual with a disability … shall, solely by reason of [his] disability, be excluded from participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).  The analysis under the Rehab Act is generally the same as under the ADA.  Freilich v. Upper Chesapeake Health, Inc., 313 F.3d 205, 214 (4th Cir. 2002).  Claims under the Rehab Act, however, require a showing of discrimination "solely by

12

reason of" disability, 29 U.S.C. § 794(a), while under the ADA, a plaintiff must only show discrimination "by reason of" disability, 42 U.S.C. § 12132. As such, the causation standards are "significantly dissimilar." Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 498 n.17 (4th Cir. 2005) (citation omitted).

Here, while the Court deemed Plaintiff's allegations sufficient to survive the low frivolity bar, he has not shown that because of his disability he was denied the benefits of services of state prisons or participation in programs or activities for which he was otherwise qualified. That is, while Plaintiff alleges that his life is made more difficult and complicated by standard-issue prison clothing that does not accommodate his disability, he has not shown that he has been unable to participate in prison programs or receive the benefit of services non-disabled prisoners receive.[7] Rather, in the pending motion, Plaintiff alleges in essence that he is fearful that he will be unable to meet the specifications or requirements of his MAPP agreement because he does not have Wrangler pants with the appropriate pockets. Plaintiff, however, does not connect this accommodation with any requirement of the MAPP program. Moreover, Defendants' evidence establishes that Plaintiff will not be deemed noncompliant with his MAPP agreement if he is unable to comply because of something outside of his control. [Doc. 46-7 at ¶ 3]. Defendants' evidence also shows that NCCE can design and manufacture clothing to meet Plaintiff's particular needs, whether for everyday wear inside prison walls or on work release assignments. [Doc. 46-5 at ¶ 3]. As such, clothing from outside retailers is unnecessary to meet Plaintiff's

---

[7] In fact, in his memorandum, Plaintiff acknowledges that while inside prison walls he is allowed to wear athletic shorts (presumably with the pockets he needs) to accommodate his disability. [Doc. 42-4 at 2]. While Plaintiff is concerned that he will be transferred to Rutherford CC where he will be unable to wear these shorts or that he will be ill-equipped to meet the requirements of his MAPP agreement with his current supply of clothing, the Defendants' evidence demonstrates that Plaintiff can and will be provided the clothing he needs to accommodate his disability outside of Foothills, whether at Rutherford CC or to participate within the terms of the his MAPP agreement.

13

disability needs. While in the past, Plaintiff has been successful in his efforts to have prison officials meet his needs by procuring specific clothing from outside retailers, these items are not required by the Agreement, nor does the evidence before the Court now show they are required to meet Plaintiff's needs.

Plaintiff has also failed to show that he will suffer irreparable harm in the absence of the relief he seeks. To prove this element, Plaintiff must show that the irreparable harm is "neither remote nor speculative, but actual and imminent." Direx Israel, Ltd. V. Breakthrough Med. Corp., 952 F.2d 802, 812 (4th Cir. 1991). Without a clear showing that the plaintiff will suffer imminent, irreparable harm, the Court cannot grant preliminary injunctive relief. Di Biase v. SPX Corp., 872 F.3d 224, 230 (4th Cir. 2017) (a "possibility of irreparable harm is insufficient to satisfy the movant's burden). Here, Defendants have shown that no special clothing is required for Plaintiff to perform work release functions or to participate in community passes. Rather, standard-issue prison clothing is the norm. Defendants, again, have also shown that NCCE can produce any clothing Plaintiff needs to perform these aspects of his MAPP agreement.

Furthermore, Plaintiff has failed to meet the third element for preliminary injunctive relief. That is, Plaintiff has not shown that the balance of equities tip in his favor. Plaintiff's stated need for Wrangler jeans and retail shirt-jackets that prison officials would have to purchase from outside retailers is significantly offset by the prison facility's need to maintain order and security and provide consistent prison clothing to the prison population. While the clothing Plaintiff requests would perhaps be the most suitable and desirable for him, prisons have a strong interest in consistency among prisoners. Defendants can meet Plaintiff's needs through clothing designed and produced by NCCE specifically for the Plaintiff while still of the same basic style, color, and material of the clothing of other prisoners.

Moreover, the equities further tip in Defendants' favor because the primary purpose of injunctive relief is to preserve the status quo pending trial. When a plaintiff seeks an order altering the status quo before the case even begins, it is called "mandatory" injunction, which are highly disfavored. League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 235 (4th Cir. 2014). Because mandatory preliminary injunctions do not preserve the status quo, they "should be granted only in those circumstances when the exigencies of the situation demand such relief." Wetzel v. Edwards, 635 F.2d 283, 286 (4th Cir. 1980). Here, rather than maintain the status quo, Plaintiff asks the Court to order prison officials to expend relatively substantial effort and resources to purchase the requested clothing for Plaintiff. Given the absence of any exigencies here, such relief is highly disfavored, and the Court will not order Defendants to comply at this stage of the litigation.

Finally, Plaintiff has not shown that the injunction is in the public interest. In this regard, Plaintiff alleges only that "it is always in the public interest for prison officials to obey the law, especially the Constitution." [Doc. 42-4 at 5 (citations omitted)]. While this is certainly true, Plaintiff has not preliminarily shown that Defendants have violated his constitutional rights or that he is likely to succeed on the merits of his ADA or Rehab Act claims. Moreover, "the public interest is best served if courts do not get involved with the daily operations of a prison or sheriff's office, especially prior to the finding of a constitutional violation." Bartlett v. Smith, 2019 WL 1051185, at *4 (E.D.N.C. Mar. 5, 2019). See Taylor v. Freeman, 34 F.3d 266, 268 (4th Cir. 1994) ("It is well established that absent the most extraordinary circumstances, federal courts are not to immerse themselves in the management of state prisons.").

Because Plaintiff has failed to satisfy the elements for preliminary injunctive relief, the Court will deny his motion. In making this ruling, however, Defendants are admonished that any

future failure to provide Plaintiff clothing he needs to accommodate his disability through special order with the NCCE, particularly on his transfer to Rutherford CC and/or as needed to fulfill his MAPP agreement outside prison walls, will be adversely viewed by the Court.

### III. CONCLUSION

For these reasons, the Court will deny Plaintiff's motion for injunctive relief.

### **ORDER**

**IT IS, THEREFORE, ORDERED** that Plaintiff's Request for Temporary Restraining Order and/or Preliminary Injunction [Doc. 42] is **DENIED**.

**IT IS SO ORDERED.**
Signed: July 18, 2024

Graham C. Mullen
United States District Judge